[Civ. No. 32024. First Dist., Div. Four. Feb. 26, 1973.]

ENVIRONMENTAL DEFENSE FUND, INC., et al.,
Plaintiffs and Appellants, v.
CALIFORNIA AIR RESOURCES BOARD et al.,
Defendants and Respondents.

830

**COUNSEL**

Thomas J. Graff and J. William Wigert, Jr., for Plaintiffs and Appellants.

Adrian Kuyper, County Counsel, and John F. Powell, Deputy County Counsel, as Amici Curiae on behalf of Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, and Roderick Walston, Deputy Attorney General, for Defendants and Respondents.

## OPINION

BRAY, J.[*]—Environmental Defense Fund, Inc., et al., plaintiffs and appellants, appeal from summary judgment of the San Francisco Superior Court in favor of California Air Resources Board, et al., defendants and respondents.[1]

### Question Presented

*California Air Resources Board does not have power to regulate the lead content in gasoline sold in California.*

### Record

Appellants filed in San Francisco Superior Court a complaint for declaratory relief against the California Air Resources Board ("CARB") and other state officials (hereinafter CARB and the state officials are jointly referred to as "respondents"). The complaint alleges that Environmental Defense Fund, Inc., in conjunction with two other organizations, caused to be filed a petition before CARB requesting CARB to adopt certain regulations. The three requested regulations are for CARB to (1) establish an ambient air quality standard for lead in California of 1.5 micrograms per cubic meter; (2) establish an exhaust emission standard for lead of zero grams per mile to be achieved by 1973; and (3) prohibit the sale of motor fuel containing more than 0.5 grams of lead per gallon commencing January 1, 1972, and the sale of motor fuel containing more than zero grams of lead per gallon commencing January 1, 1973. CARB did adopt an ambient air quality standard, but it did not establish an exhaust emission standard for lead. Appellants were informed by CARB that it had been advised by the State Attorney General that CARB did not have the authority to regulate the lead content of motor fuel. Appellants requested the superior court to determine that CARB has the power to regulate the lead content in fuel in order that CARB may address itself to the third request contained in appellants' petition.

---

[*]Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]Orange County Air Pollution Control District filed an amicus curiae brief herein, supporting appellants' motion to advance setting of oral argument. The amicus curiae brief states that the Orange County Superior Court has determined that CARB has the power to regulate the lead content of gasoline and that therefore Orange County Air Pollution Control District does not have the authority to phase out the lead content of gasoline sold in that county because the state has preempted the field by giving this authority to CARB. This determination, of course, conflicts with that of the judgment here appealed from.

Respondents filed an answer and demurrer to the complaint for declaratory relief. Respondents denied that CARB had the power to regulate the lead content of fuel in California, and on this basis respondents demurred. Respondents reasoned merely because CARB has the authority to set emission standards, does not give CARB the implied power to regulate the lead content of fuel.

Respondents then moved for summary judgment on the same ground that it did not have the power to regulate the lead content of motor fuel. Respondents caused to be filed a memorandum of points and authorities and a declaration of John A. Maga in support of the motion for summary judgment.

Appellants also filed a motion for summary judgment. This motion was supported by a memorandum of points and authorities with certain exhibits attached to the memorandum.

The superior court granted respondents' motion for summary judgment, denied appellants' motion, and overruled the demurrer made by respondents on the ground that it was rendered moot by the granting of the motion for summary judgment.

*CARB does not have the power to regulate the gasoline lead content.*

The parties entered into a stipulation whereby they agreed that "[e]xcepting the method of regulating the lead content of motor fuel, there are no known methods of reducing or eliminating lead from automobile exhaust emissions which are technologically feasible at the present time."

Appellants contend that the air pollution control legislation—which is cited as the Mulford-Carrell Air Resources Act (Health & Saf. Code, § 39000 et seq.) and the Pure Air Act of 1968 (Health & Saf. Code, § 39080 et seq.)—has given CARB ample authority to regulate lead content in motor fuel. Respondents contend that neither of the above-mentioned acts gives CARB regulatory power with respect to the composition of motor fuel. Respondents express their position in the following sentence: "Thus, the Act, in a rough sense, covers what comes out of the car, but not what goes into it."

CARB's powers are set forth in the Mulford-Carrell Air Resources Act, commencing with section 39000 of the Health and Safety Code.

Section 39010 provides that the people of the State of California have an interest in the environment in which they live, and that this environment is being polluted in a manner that is detrimental to the health, safety and

welfare of the people of California. Section 39011 provides that it is necessary to have a coordinated state, regional and local effort to combat the problems of air pollution. Section 39012 states, "Local and regional authorities have the primary responsibility for the control of air pollution except for the emissions from motor vehicles. These authorities may control emissions from nonvehicular sources."

To determine whether the Mulford-Carrell Air Resources Act enables CARB to regulate lead in gasoline, it is essential to look at different parts of the act to determine the areas that CARB has been empowered to regulate.

Section 39007 defines "vehicular sources" as "those sources of air pollution emitted from motor vehicles." Section 39009 defines "emission standards" as "specified limitations on the discharge of pollutants into the atmosphere." Section 39052, subdivision (k), provides that the CARB shall adopt test procedures to determine whether new vehicles meet the emission standards contained in the act. The exhaust emission standards for motor vehicles are contained in sections 39102, 39102.5, 39104, 39105, 39106, and 39107, which are part of the Pure Air Act of 1968. These sections provide that the emissions from a motor vehicle shall not exceed a specified number of grams per mile of hydrocarbons, carbon monoxide, and oxides of nitrogen. CARB shall also set emission standards for used motor vehicles. (§§ 39052, subd. (*l*), and 39107.6.)

CARB's basic power to adopt and enforce emission standards is clarified in sections 39052, subdivision (m), and 39052.1. Under section 39052, subdivision (m), CARB is permitted to "[a]dopt, by regulation, emission standards and test procedures applicable to motor vehicles manufactured for sale in this state. Such regulations shall provide for the testing of vehicles on factory assembly lines or in such other manner as the board determines best suited to carry out the purposes of this part. . . . Any manufacturer or distributor failing to comply with the standards or test procedures established under this subdivision shall be subject to [certain penalties]." These essential requirements are repeated and amplified in section 39068.1, adopted in 1970, to provide for (1) the retesting of vehicles which fail to meet CARB's standards during the first test, and (2) the imposition of penalties against "any manufacturer who sells, attempts to sell, or causes to be

offered for sale" a new 1973 or later model vehicle which does not meet the requirements.

Section 39052.1 authorizes CARB to establish a statewide control device testing program and to adopt standards for exhaust emissions for motor vehicles. In conjunction with the power granted to CARB to establish such a program for exhaust emissions, CARB shall select exhaust control devices which comply with the standards it sets.

The above-mentioned code sections support respondents' position that CARB's power to set emission standards is limited to devices or modifications that are part of a vehicle's engine structure, and does not include the power to regulate fuel composition. CARB's authority is to set emission standards limited under these sections to the development, testing and approval of mechanical functions of vehicles, particularly exhaust control devices or modifications of the combustion process, that will reduce the amount of pollutants emitted into the atmosphere from such vehicles. The penalties for violations of emission standards are assessed against those who manufacture or distribute motor vehicles, but not against those who produce or distribute motor fuel.

Nor, by the addition of section 39052.3 of the Health and Safety Code, has CARB's authority been broadened to include the power to regulate the content of lead in gasoline. Section 39052.3 was added to the Health and Safety Code by chapter 1152, which was approved and filed on November 27, 1972. Section 39052.3 authorizes CARB to request from an advertiser data to support any advertised claim that a fuel or fuel additive reduces motor vehicle exhaust emissions and to conduct and, requesting the assistance of the Department of Consumer Affairs, to investigate the claim of the advertiser. CARB is to report to the Attorney General for appropriate action if a fuel is not substantially as effective as claimed. Section 39052.3 mentions nothing about regulating the additives in fuel. It merely allows CARB to prevent the advertiser from making false claims about its product. The section provides that the Attorney General is to take the appropriate action from information given to him by CARB. Thus, this section clearly does not give CARB the power to regulate the content of lead in fuel, although CARB may oversee the claims made by fuel or oil companies regarding the lead in their gasoline.

Appellants attempt to rely on the legislative findings and declarations of the Pure Air Act of 1968. Section 39081 states that the emission of pollutants from motor vehicles is a primary source of air pollution in many

parts of the state and that the elimination of such pollutants is of prime importance to the health and welfare of the public. Subdivision (c) of section 39081 declares that the state has the responsibility to establish uniform procedures for compliance with standards aimed at the elimination of the emission of pollutants from automobiles. After appellants quote portions of section 39081, they contend that the Pure Air Act of 1968 is not limited to combating the problem of air pollution from motor vehicles by merely regulating the mechancial devices on a vehicle. However, it should be noted that even subdivision (a) of section 39081, which appellants cite, speaks in terms of "the emission of pollutants from motor vehicles." Webster's Third New International Dictionary defines "emission" as something that is sent forth by or as if by emitting. "Emit" is defined as follows: "to send out, discharge, release, as to throw or give off or out." Thus, the Pure Air Act of 1968 also speaks in terms of regulating the pollutants that come out of a motor vehicle. That CARB does not have the power to regulate what goes into an automobile is supported by subdivision (e) of section 39081,[2] which provides "That vehicle emission standards applied to new motor vehicles and to used motor vehicles equipped with emission control devices are standards with which all such vehicles shall comply subject to the approval, accreditation, and certification provisions of this part." Thus, the Pure Air Act of 1968 also speaks of controlling pollution by reducing the amount of pollutants emitted into the atmosphere by adding, modifying or changing the mechanical devices on a motor vehicle.

Section 39052.6 provides that CARB may adopt and implement motor vehicle emission standards for other sources of air pollution than are specifically mentioned in the Pure Air Act of 1968. It should be noted that section 39052.6 also uses the term "emission standards" which, as mentioned above, refers to the pollutants that are emitted from the automobile. Furthermore, although this section may give CARB the power to regulate other contaminants than hydrocarbons, carbon monoxide and oxides of nitrogen, the method for regulating such other pollutants would be in the manner provided in the act as discussed above—the testing of vehicles, the development of exhaust control devices, and modifications of the combustion process. Thus, even if this section gives CARB the power to regulate the lead emitted into the air from a vehicle, it does not give it the power to regulate the amount of lead put into gasoline by gasoline companies. Furthermore, under section 39052.6, CARB may set standards for other contaminants which are technologically feasible. Respondents contend, "To

---

[2]Appellants cite from section 39081 but have omitted any reference to subdivision (e) of this section.

date, no technologically feasible control device or other engine modification has been developed which reduces or eliminates lead in exhaust emissions, an assertion which the [appellants] do not challenge and in fact accept."[3]

█ CARB has consistently maintained that its authority does not include the right to regulate the lead content of motor fuel. We must accord great weight to CARB's interpretation of the statutes affecting it. According to CARB's executive officer,

"An air quality standard limits concentrations of pollutants in the air. An emission standard limits pollutant emissions from a source. A fuel composition standard specifies limitations on the concentration of a pollutant or component in a fuel.

". . . . . . . . . . . . . . . . . .

"Although an emission standard may in some cases be achieved by regulating the fuel used in a combustion process, vehicular emission standards have always been interpreted by the Air Resources Board and others involved, including legislators, to mean the use of a special device or a change in the combustion process (e.g., changes in the design of the internal combustion engine) and not a change in the composition of the fuel burned."

It is well established that an administrative agency's construction of a statute, since it is charged with the enforcement of that statute, is entitled to great weight. (*Holloway* v. *Purcell* (1950) 35 Cal.2d 220, 226 [217 P.2d 665].) █ CARB is an administrative agency created by statute and as such, it only possesses the powers that are conferred on it by statute. (*People* v. *Harter Packing Co.* (1958) 160 Cal.App.2d 464, 467 [325 P.2d 519].) An administrative agency has no authority to enact rules or regulations which alter or enlarge the terms of legislative enactments. (*California Sch. Employees Assn.* v. *Personnel Commission* (1970) 3 Cal. 3d 139, 144 [89 Cal.Rptr. 620, 474 P.2d 436].)

Given the above rules regarding administrative agencies, it is clear that this court should afford CARB's construction of its powers great weight. CARB's interpretation of the legislation does not confer on this agency any powers that were not specifically delegated to it under the Pure Air Act of 1968 and the Mulford-Carrell Air Resources Act.

---

[3]Respondents are referring to the stipulation entered into by the parties whereby they agreed that regulating the lead content in fuel is the only technologically feasible means of reducing or eliminating lead from automobile exhaust emissions.

 The study we have made of the Pure Air Act of 1968 and the Mulford-Carrell Air Resources Act clearly shows that CARB does not have the power to regulate the lead content in gasoline sold in this state.

Judgment affirmed.

Devine, P. J., and Good, J.,* concurred.

A petition for a rehearing was denied March 20, 1973, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied May 9, 1973. Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.