[L.A. No. 30358. In Bank. May 23, 1975.]

WESTERN OIL AND GAS ASSOCIATION et al.,
Plaintiffs and Respondents, v.
ORANGE COUNTY AIR POLLUTION CONTROL DISTRICT et al.,
Defendants and Appellants.

**412**

**COUNSEL**

Adrian Kuyper, County Counsel, Walter D. Webster and John F. Powell, Deputy County Counsel, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Robert H. O'Brien, Assistant Attorney General, Nicholas C. Yost and C. Foster Knight, Deputy Attorneys General, as Amici Curiae on behalf of Defendants and Appellants.

McCutchen, Black, Verleger & Shea, Philip K. Verleger, Jack D. Fudge and David A. Destino for Plaintiffs and Respondents.

Thomas J. Graff, Mary D. Nichols, Eli Chernow, C. William Simmons and S. Kingsley Macomber as Amici Curiae.

**OPINION**

**MOSK, J.**—We are called upon to decide whether an air pollution control district established under section 24198 et seq. of the Health and Safety Code[1] is authorized to regulate the amount of lead contained in gasoline sold within the district for use in motor vehicles. We conclude that this power resides not with the districts but with the statewide Air Resources Board (hereinafter ARB) established by the Mulford-Carrell Air Resources Act (§ 39000 et seq.) and that the rule adopted by defendant Orange County Air Pollution District (hereinafter district) regulating the lead content of gasoline is invalid.

In October 1971, the district adopted rule 74, which calls for a gradual reduction in the lead content of gasoline sold by retailers, beginning in July 1972, so that by July 1975, only traces of lead would appear in the gasoline sold within the district for use in automobiles. Western Oil and Gas Association, a trade association the membership of which includes most of the companies marketing gasoline in Orange County and a number of oil companies (hereinafter collectively called the oil companies) filed this action to declare rule 74 invalid and to enjoin its enforcement. The case was tried on stipulated facts, exhibits and

---

[1]All statutory references will be to the Health and Safety Code unless otherwise noted.

depositions. The trial court held that rule 74 was void and restrained the district from enforcing the regulation.

On appeal from the ensuing judgment, the record establishes the following: the major source of lead in the atmosphere is the discharge from motor vehicles in the process of burning leaded gasoline. More than 90 percent of the gasoline sold in California and Orange County is for highway vehicular use, and the only significant effect of regulating the lead content of gasoline is to reduce the emission of lead from highway vehicles and to extend the life of catalytic afterburners, a smog control device.

The ARB is authorized by statute to adopt standards of ambient air quality (§ 39051, subd. (b)), and it has set the standard for lead in the atmosphere at 1.5 micrograms per cubic meter averaged over a 30-day period. This standard was based upon evidence that concentration of lead in the air above that level is associated with the storage of lead in the body, producing detectable metabolic effects. The district has measured the concentration of lead in the air in various locations in Orange County between March 1969 and December 1972, and found that the ARB standard was exceeded during most of this period. The highest monthly average reading was 6.0 micrograms. An 80 percent reduction of lead in the atmosphere is required in order to meet the ARB's standard.

The only means to reduce the lead expelled from automobiles is by the use of mechanical devices or engine modifications which reduce or eliminate the amount of lead emitted from the exhaust of a car or by reducing the quantity of lead contained in gasoline.

The power to control air pollution has been divided by the Legislature among air pollution control districts, which were established in 1947 and have the same boundaries as counties (§ 24201), the ARB, a statewide agency created by the Mulford-Carrell Act in 1967 (§ 39000 et seq.), and regional air pollution control districts, regional authorities formed by two or more counties, which were also established by the 1967 act (§ 39350 et seq.). Each of these agencies is granted broad and sometimes overlapping powers over air pollution, but none of them is expressly authorized to regulate the lead content of gasoline. The ARB, supported by the Attorney General, until recently has maintained that it does not have such power, and its position was upheld in *Environmental Defense Fund*

v. *California Air Resources Bd.* (1973) 30 Cal.App.3d 829 [106 Cal.Rptr. 598]. After a hearing was granted in this case, the ARB reversed its previous views and now asserts that it does indeed have the power to regulate fuel content.

The district bases its right to regulate the lead content of gasoline primarily upon the general powers granted it by the Legislature to control air pollution. That authority is sufficiently broad, it is claimed, to encompass the regulation in question and unless the Mulford-Carrell Act, which was passed after the districts were established, "reassigned" such power to the ARB, rule 74 is within the district's authority. Thus, argues the district, since the *Environmental Defense Fund* case held that the ARB does not have authority to regulate fuel content, it follows that the district's residual power remains intact.

We agree that either the district or the ARB is authorized to regulate the ingredients of gasoline. We conclude, however, that in the light of practical considerations, the purposes of the Mulford-Carrell Act, and the provisions of that act, the Legislature intended to accord that power to the ARB.

## I. *Powers of the District*

Two of the provisions upon which the district relies as establishing its broad powers over air pollution are section 24262, which authorizes the district to make and enforce regulations to reduce air contaminants whenever it finds that the air is so polluted as to cause discomfort, and section 24260 which, as originally enacted,[2] authorized the district to make any orders necessary and proper to carry out the purposes of the act establishing the district.[3] The Mulford-Carrell Act, passed subsequently, granted broad powers over pollution to the ARB as well (see, e.g., § 39051, subd. (c)), including authority to adopt and implement

[2]Section 24260 was amended in 1972 to add that the district may also enforce those provisions of the Mulford-Carrell Act "relating to nonvehicular sources of air contaminants." (Stats. 1972, ch. 577, § 2, p. 987.)

[3]In support of its comprehensive powers against air pollution, the district also relies upon a statement in *Orange County Air Pollution Control Dist. v. Public Util. Com.* (1971) 4 Cal.3d 945, 948 [95 Cal.Rptr. 17, 484 P.2d 1361], that the district is "*the* agency charged with enforcing both statewide and district emission controls," and on the provisions of section 24263.7. Reliance upon the statute is misplaced, for it relates to the district's power to establish standards or prohibit sale of articles to "reduce" air contaminants. Obviously, the lead in gasoline cannot be classified as an article which reduces pollution.

emission standards for automobiles. (§§ 39052, subds. (m), (n), (o), 39052.2, 39052.5, 39052.6.) The scope of the district's authority over air pollution is expressed in section 39012 as follows: "Local and regional authorities have the primary responsibility for the control of air pollution *except for the emissions from motor vehicles.* These authorities may control emissions from *nonvehicular sources.*" (Italics added.)[4]

The power of the ARB to regulate fuel content was analyzed in *Environmental Defense Fund, supra,* 30 Cal.App.3d 829. In that case, the plaintiffs sought to compel the ARB to adopt rules limiting the lead content of gasoline. The ARB took the position that the Legislature had not given it the power to enact such regulations and that the authority to adopt emission standards for vehicles allowed it only to regulate "what comes out of the car, but not what goes into it." The court agreed, holding that the power to control emissions does not permit the ARB to regulate fuel content. It also held that the only method the ARB may employ to regulate emissions is by developing, testing and approving mechanical devices or engine modifications to prevent or reduce the emission of lead.

The district, relying upon this case, urges that the powers granted to it by the Legislature are sufficiently comprehensive to include the regulation of fuel content, and that since the *Environmental Defense Fund* case held that those powers were not "reassigned" to the ARB by the Mulford-Carrell Act, they remain intact. The district asserts also that the language of section 39012 that "local and regional authorities have the primary responsibility for the control of air pollution" reaffirms its residual power over fuel content and that the exception to the district's power for "emissions from motor vehicles" in that section does not, in the light of the holding in *Environmental Defense Fund,* impair the district's authority to regulate gasoline content. Stated another way, the district asserts that since the ARB may only govern what comes out of a car the district may regulate what goes into the vehicle.

The district's argument is meritorious if the power to control emissions does not encompass the regulation of fuel content. The "primary

---

[4]The section also provides, "In addition these authorities are empowered to establish standards more restrictive than those set by the state board. The state authority shall undertake enforcement activities only after it has determined that the local or regional authorities have failed to meet their responsibilities pursuant to the provisions of this division. Such determination shall only be made after a public hearing has been held for that purpose."

responsibility" of the district to control air pollution (§ 39012) and its general power to reduce air contaminants (§ 24262) would appear to be sufficiently comprehensive to authorize the regulation in question unless the exercise of such power by the district is either prohibited by statute or has been granted to the ARB by the Mulford-Carrell Act.

The oil companies, citing several provisions of the code which authorize the district to regulate emissions from "nonvehicular sources" of pollution (e.g., §§ 39057, 39078, 24260, 39012), contend that by this language the Legislature has forbidden the districts to regulate fuel content. We agree that by giving the district power to regulate emissions from "nonvehicular sources," together with the prohibition in section 39012 against district regulation of "emissions from motor vehicles," the Legislature intended to prevent local authorities from regulating automobile emissions. (See §§ 39007, 39008.) However, if the holding of *Environmental Defense Fund* is correct, then the fact that the district may not regulate automobile *emissions* does not prevent it from regulating fuel content.[5] Thus, the district's power to enact rule 74 would not be diminished by the provisions relied upon by the oil companies.

Nevertheless, we are unable to attribute to the Legislature an intention to allow the district to regulate fuel content. It is undisputed that the ARB has the power to regulate pollutants which come out of a car, and rationality dictates that the Legislature did not intend to accord to the separate districts, formed along county lines, the power to decide the composition of the fuel which goes into these same cars. Moreover, the ARB has been authorized by the Legislature to regulate the composition of gasoline in two specific respects (§§ 39051.1, 39051.2), and without some solid basis compelling us to hold that the Legislature intended to divide authority over fuel content between the districts and the ARB, we should not presume such an intent. There are other factors as well which demonstrate the impracticability of regulating the ingredients of gasoline on a county-by-county basis.[6]

---

[5]We discuss *infra* the holding of *Environmental Defense Fund* that the power to regulate emissions does not include the control of gasoline content. We are required to decide the correctness of this determination in order to determine the validity of rule 74. Since the district's broad powers over air pollution are limited in the present context only by the prohibition against regulation of emissions from motor vehicles, it is necessary to construe the meaning of that term in order to resolve the issues before us.

[6]The executive director of the ARB states in a declaration that most cars manufactured in 1970 or prior years require leaded fuel in order to function properly and that such cars could, under certain driving conditions, be rendered totally inoperable due to engine

## II. *Powers of the ARB*

We come, then, to the question whether the ARB has been granted the power to regulate the lead content of gasoline. As stated above, the district concedes that if the Legislature "reassigned" the power over fuel content to the ARB in the Mulford-Carrell Act, the ARB's authority would be exclusive, and rule 74 would be invalid.

■ Initially, in considering the powers of the ARB, we conclude that merely because its authority is expressed in terms of controlling "emissions" or setting "emission standards" does not in itself compel a conclusion that it is prohibited from regulating fuel content. The word "emit" means to "send out: discharge, release" (Webster's New Internat. Dict. (3d ed. 1961) p. 742.) The regulation of an emission may be accomplished either by mechanical means which control the pollutants released by an engine using leaded gasoline or by specifying the ingredients of the gasoline used in the engine. The mechanical device method has been characterized as a direct control of emissions and the fuel content method as an indirect control of emissions.

■ The crucial question is whether the Legislature intended to confine the board's power to control emissions to the mechanical device method. We find no such restriction in the Mulford-Carrell Act, and for reasons discussed *infra,* we would not be justified in implying one.

The act sets forth a comprehensive regulatory scheme for the control of pollution generated by automobiles. "Emission standards" are defined as "specified limitations on the discharge of pollutants into the atmosphere," (§ 39009) and the ARB is required to adopt emission standards for motor vehicles. (§§ 39052, subds. (m), (n), (o), 39052.5.) The Legislature has itself specified emission standards which it has found to be technologically feasible for certain pollutants, not including lead. (§§ 39100.5, 39101-39105.) These standards are expressed in terms of the amount of a particular pollutant which may be emitted by a vehicle of a stated size manufactured in 1970 and subsequent years.

---

deterioration caused by unleaded gasoline. Thus, if the districts were free to regulate the amount of lead in gasoline, many vehicles from other counties could not operate on gasoline purchased in Orange County. In addition, one type of smog control device could be damaged if vehicles used unleaded gasoline in Orange County but operated on leaded gasoline elsewhere.

In addition, as we have seen, the ARB is required to adopt air quality standards, and it has done so for lead pollutants. Section 39276 calls on the board to "endeavor to attain" such standards.

Significantly, section 39052.6 provides that the ARB may *adopt* and *implement* motor vehicle emission standards for the control of contaminants other than those specified by the Legislature, which the board has found necessary and technologically feasible to carry out the purposes of the act, and section 39051, subdivision (c), authorizes the ARB to adopt any regulations necessary for the proper execution of its powers. It cannot be denied that these provisions allow the board to adopt emission standards for lead and to implement the standards adopted.

There is no express restriction in the statutes as to the manner in which that implementation may be accomplished, and we would be unjustified in implying a restriction to mechanical means in the light of the purposes of the act and the state of technology relating to the control of lead contaminants. The Legislature has declared the policy underlying the act as follows: the people of the state have a primary interest in the quality of their environment, which is being degraded by air pollution. (§ 39010.) The principal source of such pollution in many portions of the state is emissions from motor vehicles, and the control and elimination of these pollutants are of prime importance to protect public health and welfare. The goal for pure air quality is the achievement of an atmosphere with no significant adverse effects from motor vehicle pollution by 1975. (§ 39081.) In *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814 [114 Cal.Rptr. 577, 523 P.2d 617], we observed that these provisions evidence the Legislature's determination that pollution control should be accomplished as expeditiously as possible.

There is no dispute that at the time these ambitious goals were announced, the only means available to significantly reduce lead contaminants emitted by automobiles was by regulating fuel composition, since there were no mechanical devices adaptable to that purpose. It is at the very least highly debatable whether such devices exist today.[7]

---

[7]In *Environmental Defense Fund,* decided in February 1973, the ARB and the plaintiff stipulated that there were no technologically feasible control devices or engine modifications which would reduce or eliminate lead in exhaust emissions. (30 Cal.App.3d 829, 835-836.) A declaration in the records by the executive officer of the ARB, made in 1971, is substantially to the same effect. The oil companies claim that there now exists a device to reduce lead emissions, relying upon a 1973 deposition in the record from a witness who stated that he "thinks" it is feasible to control emissions by

If we were to hold that the ARB has no power to regulate fuel content, we would be attributing to the Legislature an intention to deprive the agency of the only realistic means at its disposal to achieve the purposes of the act.

The oil companies contend that many undesirable consequences would occur if lead is eliminated from gasoline, and that the Legislature has impliedly determined that the price of such elimination is greater than the benefits to be derived therefrom. Thus, it is asserted, the Legislature has decided that lead pollutants may be controlled only by the gradual phasing out of cars which required leaded gasoline[8] or by mechanical devices which will reduce lead emissions. They rely in this connection upon the Legislature's failure to adopt measures which would have reduced the lead content of gasoline or which would have permitted the ARB to regulate fuel content.

We do not find these arguments persuasive. While there clearly are serious technical problems in eliminating lead from gasoline,[9] the ARB is limited to implementing only those lead emission standards which it finds to be "necessary and technologically feasible." (§ 39052.6.) We are not concerned here with whether the ARB must actually undertake the administrative task of prescribing and implementing such standards, but only with whether it is forbidden to do so. The Legislature's failure to pass additional statutes cannot be deemed an express intent to prohibit the board from exercising the power it already had to specify fuel additives; such an implication would be unjustified in the light of the more reasonable inference that the Legislature did not intend to deprive the ARB of the only feasible means to achieve the Legislature's previously stated goal.

It follows from the foregoing analysis that we disapprove *Environmental Defense Fund* v. *California Air Resources Bd., supra,* 30 Cal.App.3d 829.

---

the use of a lead trap. He goes on to say, however, that there have been no "breakthroughs" in the technology of lead trap devices recently, and in any case the devices to which he refers are not commercially available. The ARB has power to accredit lead trap devices which are effective (§ 39175, subd. (d)), but thus far it has refrained from exercising that power.

[8]Section 39151 places restrictions upon the sale of new automobiles which require leaded gasoline to operate.

[9]The oil companies point to evidence, for example, that many older cars cannot burn lead-free gasoline, that the elimination of lead might require the use of other undesirable additives, and that the price of gasoline would be increased if the removal of lead was required.

The district contends that it will be unable to comply with the federal Clean Air Act (42 U.S.C. § 1857 et seq.) unless it is granted the power to regulate fuel content. It urges that, pursuant to a requirement that each state adopt and enforce a plan to achieve air quality (42 U.S.C. § 1857c-5), California has filed a plan in which it represented that the districts may regulate gasoline content, and that a denial of the district's authority would conflict with that representation. Since we hold that another instrumentality of the state, the ARB, may regulate fuel additives, this contention is unpersuasive.

It is also claimed that our decision will render the district powerless to meet other federal requirements, such as the district's obligation to regulate vehicular traffic during air pollution emergencies (42 U.S.C. § 1857c-5(a)(2)(F)(v)) or to regulate the construction of facilities which would indirectly generate pollution from automobiles (42 U.S.C. § 1857c-5(a)(2)(B)). We fail to see that a determination the district cannot regulate fuel content will have any appreciable effect on such authorized activities. The question whether such regulations are within the district's power will depend largely upon whether they come within the prohibition against regulating automobile emissions. Nor are we concerned here with whether the district may regulate the recovery of gasoline vapors generated during the fueling of motor vehicles. There is no evidence in the record as to how such vapors may be controlled or whether the vapors are emitted from the vehicles or the gas pump apparatus.

The judgment is affirmed.

Wright, C. J., McComb, J., Clark, J., Richardson, J., Files, J.,* and Kaus, J.,* concurred.

Respondents' petition for a rehearing was denied June 19, 1975. Tobriner, J., and Sullivan, J., did not participate therein.

*Assigned by the Chairman of the Judicial Council.