Filed 11/24/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ENGINE MANUFACTURERS ASSOCIATION, | C071891 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 34201000082774CUMCGDS) |
| CALIFORNIA AIR RESOURCES BOARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne W.L. Chang, Judge.  Reversed with directions.

Kamala D. Harris, Attorney General, Robert W. Byrne, Assistant Attorney General and Nicholas Stern, Deputy Attorney General for Defendant and Appellant.

CHICAGO LAW PARTNERS and Timothy A. French; GREENBERG TRAURIG, James M. Mattesich and Nancy J. Doig for Plaintiff and Respondent.

Engine Manufacturers Association (EMA) challenges certain regulations adopted by the California Air Resources Board (CARB) requiring engine manufacturers to obtain a sample of emissions of in-use heavy-duty engines equipped with on-board diagnostic

1

(OBD) systems that are nearing the end of their certified useful life and conduct a series of tests on these engines "to assure that engines certified for sale in California are equipped with OBD systems that properly function . . . ." (Cal. Code Regs., tit. 13, § 1971.5, subd. (a)(2); *id*., subds. (a)(1), (c).) The challenged regulations also contain provisions requiring CARB to order the recall and repair of all engines that have been determined to be equipped with a non-conforming OBD system where certain conditions exist. (*Id*., subd. (d)(3).) EMA's operative complaint sought a judicial declaration that the challenged regulations, which will be described in greater detail in the background portion of this opinion, are in excess of CARB's statutory authority and therefore invalid. The trial court granted EMA's motion for judgment on the pleadings and declared the challenged regulations invalid. CARB appeals.

We reverse. As we explain, the Legislature has granted CARB broad authority to adopt regulations designed to reduce air pollution caused by motor vehicle emissions as expeditiously as possible, subject to cost-effectiveness and feasibility limitations. (See Health & Saf. Code, §§ 39601, 43013, 43018.)[1] While CARB "has no power to vary or enlarge the terms of an enabling statute," and may not "issue regulations which conflict with [an enabling statute] or any other statute[,] . . . the absence of any specific provisions regarding [manufacturer testing of in-use heavy-duty engines equipped with OBD systems and mandatory recall of engines determined to be equipped with a non-conforming OBD system] does not mean that such . . . regulation[s] exceed[] statutory authority; in our view, it indicates only that the Legislature did not itself desire to determine the proper [method of regulating such systems]. [Citations.] Courts have long recognized that the Legislature may elect to defer to and rely upon the expertise of administrative agencies. [Citations.]" (*Credit Ins. Gen. Agents Assn. v. Payne* (1976) 16

---

[1]    Undesignated statutory references are to the Health and Safety Code.

Cal.3d 651, 656 (*Payne*).)  We conclude the challenged regulations fall within the scope of authority conferred by the Legislature unless manufacturer in-use testing of OBD systems on heavy-duty engines is prohibitively costly.  However, the question of prohibitive cost cannot be settled on the pleadings.  The remaining question, whether the regulations are reasonably necessary to effectuate the statutory purpose, was not properly raised in EMA's motion for judgment on the pleadings.  Nor does EMA advance an argument regarding the issue on appeal.  We therefore reverse and remand the matter to the trial court with directions to deny EMA's motion for judgment on the pleadings.

BACKGROUND

CARB "is the state agency charged with coordinating efforts to attain and maintain ambient air quality standards, to conduct research into the causes of and solution to air pollution, and to systematically attack the serious problem caused by motor vehicles, which is the major source of air pollution in many areas of the state." (§ 39003.)  EMA is a not-for-profit trade association representing manufacturers of engines used in heavy-duty motor vehicles, including the engines covered by the challenged regulations.

*On-Board Diagnostic Systems*

CARB requires most engines in vehicles certified for sale in California to be equipped with an OBD system.  (Cal. Code Regs., tit. 13, §§ 1968.2, subd. (b) [applies to 2004 and subsequent model-year passenger cars, light-duty trucks, and medium-duty vehicles and engines], 1971.1, subd. (b) [applies to 2010 and subsequent model-year heavy-duty engines].)  These OBD systems, "through the use of an onboard computer(s), shall monitor emission systems in-use for the actual life of the engine and shall be capable of detecting malfunctions of the monitored emission systems, illuminating a malfunction indicator light (MIL) to notify the vehicle operator of detected malfunctions, and storing fault codes identifying the detected malfunctions."  (*Id*., §§ 1968.2, subd. (a), 1971.1, subd. (a).)  The declared purpose of requiring such systems is to "ensure

3

reductions in in-use motor vehicle and motor vehicle engine emissions through improvements of emission system durability and performance." (*Id*., § 1971.1, subd. (a).) EMA does not challenge this requirement.

### *Pre-Certification Testing of OBD Systems*

Before manufacturers are permitted to sell new motor vehicles or new motor vehicle engines, CARB must certify that the vehicle or engine meets emission standards. (§ 43102, subd. (a).) Section 43101 requires CARB to adopt and implement such standards, subject to the requirement that they be "necessary and technologically feasible to carry out the purposes of [Division 26 of the Health and Safety Code]." (§ 43101, subd. (a).) Section 43104 requires CARB to "adopt, by regulation, test procedures and any other procedures necessary to determine whether the vehicles or engines are in compliance with the emissions standards established pursuant to Section 43101," and further provides such procedures shall be based on "federal test procedures or on driving patterns typical in the urban areas of California."

Light-duty vehicles are tested for emission compliance on a chassis dynamometer, a platform with large steel rollers on which the vehicle can be operated at prescribed speeds for prescribed periods of time. Vehicle emissions are measured and compared against the applicable emission standards. Heavy-duty vehicle engines are typically tested for emission compliance outside their intended vehicle on an engine dynamometer, a machine that can cause the engine to operate at prescribed speeds and under prescribed loads for long or short periods of time to generate an operating cycle that is representative of how the engine might operate in a heavy-duty vehicle driving on California roads. Equipment attached to the engine measures and compares the emissions generated against applicable standards.

As part of the certification process, manufacturers of heavy-duty vehicle engines must demonstrate that the engine's OBD system will function properly for the "actual life" of the engine, i.e., "the entire period that an engine is operated on public roads in

4

California up to the time an engine is retired from use." (Cal. Code Regs., tit. 13, § 1971.1, subds. (c), (d)(1.3).) This can be as much as 435,000 miles for the heaviest vehicles. In order to demonstrate the performance and durability of the OBD system, manufacturers put a certain number of test engines through an "accelerated aging process" on an engine dynamometer and then test the OBD system's ability to detect various malfunctions by replacing each of the engine's major emission controls, one at a time, with malfunctioning emission controls. (*Id*., subd. (*i*)(2), (3).) If the engine's OBD system illuminates an MIL "prior to emissions exceeding the applicable emission threshold malfunction criteria" specified in the regulation, the OBD system has passed the test and "no further demonstration is required." (*Id*., subd. (*i*)(5.1.2).) EMA does not challenge these pre-certification testing requirements.

### *The Challenged Regulations*

The challenged regulations require heavy-duty engine manufacturers to verify OBD system performance by duplicating the pre-certification testing on a sample of in-use production engines, starting with the 2010 model year. (Cal. Code Regs., tit. 13, §§ 1971.1, subd. (*l*)(4), 1971.5, subd. (c)(3)(C).) In selecting engines to be included in the test sample group, manufacturers are required to use only engines that, among other things, are "certified to the requirements of title 13 [of the California Code of Regulations], section 1971.1" and have "mileage that is between 70 to 80 percent of the certified full useful life mileage and an age of less than the certified full useful life age for the subject engines." (*Id*., § 1971.5, subd. (c)(2)(C)(i).) The number of engines to be tested depends on the model year and the number of engine families certified by the manufacturer in that model year.[2] For example, "[f]or the 2013 and subsequent model

---

[2] " 'Engine family' means a grouping of vehicles or engines in a manufacturer's product line determined in accordance with [title 40 of the Code of Federal Regulations, section] 86.098-24." (Cal. Code Regs., tit. 13, § 1971.1, subd. (c).)

5

years, a manufacturer certifying one to five engine families in a model year shall provide emission test data of a test engine from one engine rating.[3]  A manufacturer certifying six to ten engine families in a model year shall provide emission test data from test engines from two engine ratings.  A manufacturer certifying eleven or more engine families in a model year shall provide emission test data of test engines from three engine ratings."  (*Id*., subd. (c)(2)(B)(ii).)  Testing must be completed "[w]ithin three calendar years after the model year of the engine (e.g., by the end of calendar year 2013 for a 2010 model year engine)."  (*Id*., subd. (c)(3)(A).)

As with the pre-certification testing, if the OBD system properly illuminates an MIL prior to emissions exceeding the applicable emission threshold malfunction criteria, "no further testing is required."  (Cal. Code Regs., tit. 13, § 1971.5, subd. (c)(4)(A).)  If, however, the OBD system does not illuminate an MIL for one or more monitors before emissions exceed the malfunction criteria, "the engine manufacturer shall conduct further testing on additional engines."  (*Id*., subd. (c)(4)(B).)  Specifically, within six months after the completion of the failed test, the engine manufacturer shall test an additional four engines from the same engine rating and engine family as the failed test engine, but shall be required to test only the monitors for which the OBD system did not illuminate the MIL before emissions exceeded the malfunction criteria.  (*Id*., subd. (c)(4)(B)(i), (ii).)  If the OBD system on three or more of the additional test engines properly illuminates the MIL for the tested monitor or monitors before emissions exceed the malfunction criteria, "no further testing is required."  (*Id*., subd. (c)(4)(C).)  However, if the OBD system on two or more of the additional test engines also fails the test, the engine manufacturer shall

---

**3**　　" 'Engine rating' means a unique combination of displacement, rated power, calibration (fuel, emission, and engine control), [auxiliary emission control devices], and other engine and emission control components within an engine family."  (Cal. Code Regs., tit. 13, § 1971.1, subd. (c).)

6

test an additional five engines from the same engine rating and engine family as the previously tested engines. (*Id.*, subd. (c)(4)(D)(i), (ii).)

The manufacturer is required to submit a report of the test results to CARB's executive officer, who shall make a determination as to nonconformance of the OBD system in the engine class using specified criteria. (Cal. Code Regs., tit. 13, § 1971.5, subd. (c)(6)(A), (7).) For example, "[f]or 2013 through 2015 model year engines: [¶] a. All engines classified as OBD parent and child ratings[4] . . . shall be considered to be nonconforming if the emission test results indicate that 50 percent or more of the engines in the test sample group do not properly illuminate the MIL when emissions exceed 2.0 times the malfunction criteria (e.g., 4.0 times the standard if the malfunction criterion is 2.0 times the standard)."[5] (*Id.*, subd. (b)(6)(A)(ii).)

Among other remedial actions, the challenged regulations require the executive officer to "order the recall and repair of all engines in an engine class that have been determined to be equipped with a nonconforming OBD system" if one or more of a list of criteria is satisfied. (Cal. Code Regs., tit. 13, § 1971.5, subd. (d)(3)(A).) For example,

---

**4**      " 'OBD parent rating' means the specific engine rating selected according to [title 13 of the California Code of Regulations, section 1971.1](d)(7.1.1) or (d)(7.2.2)(B) for compliance with section 1971.1." (Cal. Code Regs., tit. 13, § 1971.1, subd. (c).) " 'OBD child rating' means an engine rating (other than the OBD parent rating) within the engine family containing the OBD parent rating selected according to section (d)(7.1.1) or an engine rating within the OBD group(s) defined according to section (d)(7.2.1) and subject to section (d)(7.2.3)." (*Ibid.*)

**5**      The challenged regulations also define " '*Nonconforming OBD System*' " to mean "an OBD system on a production engine that has been determined not to comply with the emission standards as defined in [title 13 of the California Code of Regulations], section 1971.1(c), irrespective of whether engines in the engine class, on average, meet other applicable emission standards (e.g., exhaust emission standards defined in [title 13 of the California Code of Regulations], section 1956.8, evaporative emission standards defined in [title 13 of the California Code of Regulations], section 1976)." (Cal. Code Regs., tit. 13, § 1971.5, subd. (c)(3).)

"[f]or 2013 through 2015 model year OBD parent and child ratings," recall is required if testing or other information received from the manufacturer indicates "the OBD system is unable to detect and illuminate the MIL for a malfunction of a component/system monitored by the major monitor prior to emissions exceeding: [¶] a. . . . three times the applicable major monitor malfunction criteria (e.g., if the malfunction criteria is 2.5 times the applicable standard, recall would be required when emissions exceed 7.5 times the applicable standard . . .)." (*Id*., subd. (d)(3)(A)(ii).) Exceptions to the mandatory recall requirement are provided for in the regulations. (*Id*., subd. (d)(3)(B).) Upon issuance of a recall order, the manufacturer may contest the decision at a public hearing. (*Id*., subd. (d)(7).) Finally, the challenged regulations require manufacturers to "develop a remedial action plan" when "initiating a remedial action . . . other than payment of monetary penalties[6]" and provide for penalties for failure to comply with such an action plan. (*Id*., subds. (e)(1)(A), (f).)

### *The Present Lawsuit and Motion for Judgment on the Pleadings*

In July 2010, EMA filed the present lawsuit seeking a judicial declaration that the challenged regulations are in excess of CARB's statutory authority and therefore invalid. The complaint alleges CARB exceeded its statutory authority by adopting regulations that: "(i) unlawfully require HD engine manufacturers to conduct onerous and costly OBD system testing of in-use non-new HD diesel engines that have been sold into commerce, and that are beyond the manufacturers' custody and control; and (ii) unlawfully mandate the recall of HD diesel engines without the required showing under

---

**6**      EMA does not challenge the provision authorizing CARB's executive officer to seek monetary penalties "for violations of the requirements of [title 13 of the California Code of Regulations], section 1971.1 or for production engines otherwise failing to be equipped with OBD systems that have been certified by [CARB]." (Cal. Code Regs., tit. 13, § 1971.5, subd. (d)(5).)

8

California law that there has been a violation of an emission standard or emissions test procedure."

The following month, CARB filed an answer. EMA filed a motion for judgment on the pleadings in November 2010. With the motion, EMA requested that the trial court take judicial notice of the challenged regulations, an unpublished superior court decision in an unrelated case, a copy of an agreement entered into between CARB, EMA, and certain engine manufacturers, and portions of CARB's rulemaking file for the challenged regulations. In January 2011, CARB filed an opposition to the motion and requested that the trial court take judicial notice of an executive order issued by its executive officer certifying certain medium-duty vehicles as meeting emission standards and indicating the certified engines would be subject to in-use testing under title 13 of the California Code of Regulations, section 2139, subdivision (c). The following month, EMA filed a reply memorandum and requested that the trial court take judicial notice of certain additional regulations (Cal. Code Regs., tit. 13, §§ 2136-2140) and a document detailing CARB's share of the Governor's proposed 2011-2012 budget.

The trial court, through Judge Thomas E. Warriner, issued a tentative decision denying the motion for judgment on the pleadings (initial tentative decision). The initial tentative decision divided the challenged regulations into two categories: "in-use OBD testing" provisions and "recall" provisions. With respect to the former, the tentative decision assumed CARB lacked express statutory authority to issue the challenged regulations, but concluded, "the pleadings do not settle the issue of [CARB's] implied authority" to do so, explaining: "Whether [CARB] possesses the implied authority to sustain the challenged in-use regulations depends on whether the regulations are consistent with [CARB's] statutory mandates, as opposed to contradicting them. [Citation.] In adopting regulations to enforce its mandates, [CARB] is not limited to the exact provisions of any statute. [Citation.] [CARB] can fill up the details of the statutory scheme. [Citation.] [¶] Hence, for example, the California Supreme Court held in

9

[*Western Oil & Gas Assn. v. Orange County Air Pollution Control Dist.* (1975) 14 Cal.3d 411] that [CARB's] authority to control vehicle emissions brought with it the implied authority to regulate lead, a fuel input. The [*Western Oil*] court, however, reasoned that [CARB] possessed this implied authority because, without it, [CARB] would have had no realistic means of controlling the emissions the Legislature had empowered it to reduce. [Citation.] This reasoning, combined with the standards governing motions for judgment on the pleadings, lead the court in the instant case to conclude that the EMA's motion for judgment on the pleadings should be denied." The initial tentative decision also noted EMA's argument the in-use OBD testing regulations "are prohibitively costly," found this to be potentially "problematic" because "[t]he Legislature could not have authorized [CARB] to issue regulations with which manufacturers have no means to comply," but explained CARB's denials as to the prohibitive nature of the cost prevented the court from granting EMA's motion for judgment on the pleadings.

With respect to the challenged recall provisions, the initial tentative decision concluded CARB "possesses the implied authority" to order a manufacturer recall of engines that fail the in-use OBD testing, explaining: "As indicated above, [CARB] has broad mandates to reduce vehicle emissions, including diesel emissions from [heavy-duty] vehicles. As the court understands them, the recall regulations at issue are meant to minimize the likelihood that [heavy-duty] vehicles with defective OBD systems will remain in use without the capacity to notify vehicle operators that emissions-related inspections and repairs may be required. The court does not see how such regulations are inconsistent with the powers that the Legislature has granted [CARB]." The initial tentative decision also requested that the parties address three questions regarding the in-use OBD testing issue and three questions regarding the recall issue at the time of the hearing on the motion.

In July 2011, prior to the hearing on the motion, the matter was transferred to Judge Shelleyanne W. L. Chang. Judge Chang directed the parties to submit

10

supplemental briefs addressing the issues raised in the initial tentative decision. CARB's supplemental brief came with an additional request that the trial court take judicial notice of a resolution stating CARB's findings that the challenged regulations are "necessary, cost-effective, and technologically feasible" and a United States Environmental Protection Agency (EPA) document granting CARB a federal Clean Air Act preemption waiver for its OBD system regulations applicable to light-duty and medium-duty vehicles. EMA also submitted the requested supplemental brief as well as a rebuttal to CARB's supplemental brief. The following month, the trial court issued a tentative decision denying EMA's motion for a very different reason: standing. The tentative decision explained: "[CARB] has not opposed the motion on the ground that EMA lacks standing or that the pleadings do not present a justiciable controversy sufficient to advance a declaratory relief action. Indeed, the parties and the court have proceeded on the assumption that the complaint and answer present a justiciable controversy over which the court may exercise jurisdiction. Thus the court issued a detailed tentative ruling . . . and requested supplemental briefing relative to certain substantive issues. [¶] On further review of the pleadings, however, the court observes that [CARB] denied EMA's allegations regarding its associational standing to challenge the subject regulations. This denial appears to be dispositive."

Because CARB never intended to challenge EMA's standing to bring the lawsuit, pursuant to an agreement between the parties, EMA redrafted the factual basis for its standing in an amended complaint filed in September 2011. CARB's answer admitted EMA's allegations regarding standing and denied almost every other allegation of the complaint. EMA then filed a new motion for judgment on the pleadings. The parties filed nearly identical versions of their earlier briefs, re-filed their supplemental briefs as exhibits to the primary briefs, and requested that the trial court take judicial notice of the same documents previously requested.

11

In June 2012, the trial court (Judge Chang) granted each request for judicial notice (except with respect to the unpublished superior court decision and the settlement agreement), noting it would "not accept the truth of the factual assertions therein," and granted the motion for judgment on the pleadings.[7] The trial court first ruled the challenged regulations did not fall within CARB's "broad authority to adopt regulations that reduce air pollution resulting from in-use emissions," explaining: "CARB states that the [OBD] systems on heavy duty engines result in significantly lower exhaust emissions. Although CARB cites to [a portion of the rulemaking file that was judicially noticed] to support this position, the Court does not accept the truth of the factual assertions therein. [Citation.] CARB further states that 'in-use testing of diagnostic systems and recalls of defective systems ensure that the systems function properly and achieve this result.' This general statement, however, is not supported by the language of the [challenged regulations]. [¶] The definition of 'Nonconforming OBD System' states that ' . . . For purposes of section 1971.5, an engine class shall be considered nonconforming *irrespective of whether engines in the engine class, on average, meet applicable tailpipe or evaporative emission standards*. CARB may order recall of engines in an engine class that have been equipped with nonconforming OBD Systems.' [Citation.] Based on the explicit language of the regulation a 'nonconforming OBD system' is not related to emission standards, the testing could result in the recall of engines even if, on average,

---

[7] EMA requests that we also take judicial notice of the challenged regulations, the unpublished superior court decision, portions of the rulemaking file, the additional regulations (Cal. Code Regs., tit. 13, §§ 2136-2140), and the document detailing CARB's share of the Governor's proposed 2011-2012 budget. We do so, with the exception of the superior court decision. (Evid. Code, § 459, subd. (a).) In addition to the documents subject to prior requests for judicial notice, EMA requests that we take judicial notice of the following state and federal regulations: title 13 of the California Code of Regulations, §§ 1956.8, 1968.5, 2141-2149, 2182; title 40 of the Code of Federal Regulations, §§ 86.000-26, 86.004-2, 86.004-26, 86.007-11(a)(4). We grant this request. (Evid. Code, § 452, subd. (b).)

they meet emission standards. Thus, the testing may not assist in the attainment of air quality standards. Accordingly, the [challenged regulations] do not fall within CARB's broad authority to regulate pollution from in-use emissions."[8]

The trial court also concluded sections 43104 and 43105, which will be described more fully in the discussion portion of this opinion, did not authorize CARB to adopt the challenged regulations because these statutory provisions unambiguously apply to "new motor vehicles" and "new motor vehicle engines," not "in-use vehicles." Nor would these provisions save the challenged regulations even if they applied to in-use vehicles because, contrary to section 43105, they "allow the recall without first demonstrating that 'the manufacturer has violated emission standards or test procedures.' " Finally, the trial court concluded the challenged regulations were not "reasonably necessary to effectuate the purpose of [sections] 43104 and 43105."

---

[8] The trial court's decision cites title 13 of the California Code of Regulations, section 1971.5, subdivision (3)(A), for the quoted language. There is no such subdivision. We conclude the trial court intended to cite to subdivision (a)(3). The quoted language matches that of the final regulation order contained in the record. However, the current version of the regulation, as previously noted, defines " 'Nonconforming OBD System' " to mean "an OBD system on a production engine that has been determined *not to comply with the emission standards* as defined in [title 13 of the California Code of Regulations], section 1971.1(c), *irrespective of whether engines in the engine class, on average, meet other applicable emission standards* (e.g., exhaust emission standards defined in [title 13 of the California Code of Regulations], section 1956.8, evaporative emission standards defined in [title 13 of the California Code of Regulations], section 1976)." (Cal. Code Regs., tit. 13, § 1971.5, subd. (a)(3), italics added.) The second quoted sentence in the trial court's decision appears to be an incomplete paraphrase of subdivision (d)(3)(A), specifically, "the Executive Officer shall order the recall and repair of all engines in an engine class that have been determined to be equipped with a nonconforming OBD system . . . ." (*Id.*, subd. (d)(3)(A).) However, as previously explained, this subdivision continues, "if enforcement testing conducted pursuant to [subdivisions] (b) or (c) above or information received from the manufacturer indicates that [certain other criteria are satisfied]." (*Ibid.*)

13

## DISCUSSION

## I

### *Standard of Review*

"Motions for judgment on the pleadings are usually made by defendants. In such instances the motion is the equivalent of a general demurrer, and on appeal from the judgment the appellate court will assume the truth of all facts properly pleaded in the complaint. [Citation.] Motions by a plaintiff for judgment on the pleadings, which are less common, are the equivalent of a demurrer to an answer, and the standard of review is obverse: the appellate court will assume the truth of all facts properly pleaded in the answer and will disregard the controverted allegations of the complaint. [Citations.]" (*Sebago, Inc. v. City of Alameda* (1989) 211 Cal.App.3d 1372, 1379-1380 (*Sebago*).) Such a motion "must be denied if the defendant's pleadings raise a material issue or set up affirmative matter constituting a defense." (*MacIsaac v. Pozzo* (1945) 26 Cal.2d 809, 812-813.) Stated differently, "[w]here the answer, fairly construed, suggests that the defendant may have a good defense, a motion for judgment on the pleadings should not be granted." (*Barasch v. Epstein* (1957) 147 Cal.App.2d 439, 443.)

EMA's operative complaint challenges certain regulations, the validity of which are governed by Government Code section 11342.2: "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute." There are two prongs to the analysis, each subject to a different standard of review. First, "the judiciary independently reviews the administrative regulation for consistency with controlling law. The question is whether the regulation alters or amends the governing statute or case law, or enlarges or impairs its scope. In short, the question is whether the regulation is within the scope of the authority conferred; if it is not, it is void. This is a question particularly

14

suited for the judiciary as the final arbiter of the law, and does not invade the technical expertise of the agency." (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 108-109, fns. omitted.) Second, the "reasonable necessity" prong "generally does implicate the agency's expertise; therefore, it receives a much more deferential standard of review. The question is whether the agency's action was arbitrary, capricious, or without reasonable or rational basis." (*Id.* at p. 109, fns. omitted.)

Aside from admitting the challenged regulations were adopted, they relate to the OBD systems motor vehicle engine manufacturers design and install into their heavy-duty diesel engine products, and other similarly non-controversial matters, CARB denied each allegation of EMA's complaint. Thus, the practical effect of the standard of review is to bring before us the text of the challenged regulations and statutes authorizing CARB to adopt such regulations, which we must independently review for consistency under the first prong of the analysis. (See *Sebago*, *supra*, 211 Cal.App.3d at p. 1381.) As already indicated, the second prong of the analysis was not properly raised in EMA's motion for judgment on the pleadings. Nor does EMA advance an argument regarding the issue on appeal. However, because the trial court appears to have ruled on the issue, we note CARB's reasons for adopting the challenged regulations can be found in portions of the rulemaking file, which were judicially noticed by the trial court, but effectively disregarded with the statement the trial court would "not accept the truth of the factual assertions therein." "A trial judge deciding a motion for judgment on the pleadings may also consider, in addition to facts pleaded, any matters subject to judicial notice." (*Id.* at p. 1380.) We too may consider the rulemaking file on appeal, and we may "take judicial notice of [the rulemaking file] in a tenor different from that noticed by the trial court." (Evid. Code, § 459, subd. (a).) The burden was on EMA to demonstrate the rulemaking file "does not reasonably support" the challenged regulations "in light of the purposes of the statute[s]" authorizing the regulations. (*Payne*, *supra*, 16 Cal.3d at p. 657.)

15

## II

### *Validity of the Challenged Regulations*

We conclude the trial court erred in granting EMA's motion for judgment on the pleadings because CARB's "answer, fairly construed, suggests [the agency] may have a good defense." (*Barasch v. Epstein*, *supra*, 147 Cal.App.2d at p. 443.)  We reach this conclusion for the same reasons expressed in the initial tentative decision.  Specifically, as we explain immediately below, unless manufacturer in-use testing of OBD systems on heavy-duty engines is prohibitively costly, the challenged regulations are " 'in harmony with, and not in conflict with or contradictory to,' existing provisions of law." (*California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 312, quoting Gov. Code, § 11349, subd. (d).)  However, the question of prohibitive cost cannot be settled on the pleadings.  Nor can the question of reasonable necessity.

### A.

### *Statutory Authority*

Under the first prong of the analysis, we independently review the challenged regulations for consistency with controlling law.  (*Communities for a Better Environment v. California Resources Agency*, *supra*, 103 Cal.App.4th at p. 108.)  As our Supreme Court has explained:  "[Q]uasi-legislative rules are reviewed independently for consistency with controlling law.  A court does not, in other words, defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature.  The court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4.)  In interpreting the statutes granting regulatory authority to CARB, we employ well-settled rules of statutory construction.  "Our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain

and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

Section 39601, subdivision (a), requires CARB to "adopt standards, rules, and regulations . . . necessary for the proper execution of the powers and duties granted to, and imposed upon, [CARB] by [Division 26 of the Health and Safety Code] and by any other provision of law." One of CARB's statutory duties is to "systematically attack the serious problem caused by motor vehicles, which is the major source of air pollution in many areas of the state." (§ 39003; see also § 43000, subd. (a) ["emission of air pollutants from motor vehicles is the primary cause of air pollution in many parts of the state"].) More specifically, section 43013, subdivision (a), grants CARB the authority to "adopt and implement motor vehicle emission standards, *in-use performance standards*, and motor vehicle fuel specifications for the control of air contaminants and sources of air pollution which [CARB] has found to be necessary, cost-effective, and technologically feasible, to carry out the purposes of this division, unless preempted by federal law." (Italics added.) Section 43018, subdivision (c), directs CARB to "adopt standards and regulations which will result in the most cost-effective combination of control measures on all classes of motor vehicles and motor vehicle fuel, including," among others, "[r]eductions in . . . in-use emissions from motor vehicles through improvements in emission system durability and performance." Subdivision (a) of this section requires CARB to "endeavor to achieve the maximum degree of emission reduction possible from vehicular and other mobile sources in order to accomplish the

17

attainment of the state standards at the earliest practicable date." (§ 43018, subd. (a); see also § 43013, subd. (h) ["intent of the Legislature that [CARB] act as expeditiously as is feasible to reduce nitrogen oxide emissions from diesel vehicles . . . which significantly contribute to air pollution problems"]; 43000.5, subd. (b) [declaring need for "substantial improvements in the durability of vehicle emissions systems"].)

Read together, these statutes grant CARB broad authority to adopt regulations, including in-use performance standards, designed to reduce air pollution caused by motor vehicle emissions as expeditiously as possible, subject to cost-effectiveness and feasibility limitations. " 'Performance standard' means a regulation that describes an objective with the criteria stated for achieving the objective." (Gov. Code, § 11342.570.) Without repeating all of the details, the challenged regulations require heavy-duty engine manufacturers to perform in-use testing on a sample of their engines to verify OBD system performance. (Cal. Code Regs., tit. 13, §§ 1971.1, subd. (*l*)(4), 1971.5, subd. (c)(3)(C).) These in-use testing provisions describe an objective, i.e., the proper functioning of the OBD system (*id*., § 1971.5, subd. (a)(2)), and set criteria for achieving that objective, i.e., the malfunction criteria defined in title 13 of the California Code of Regulations, section 1971.1, subdivisions (e) through (g). (*Id*., § 1971.5, subd. (c)(4).) We conclude these provisions qualify as performance standards within the meaning of Government Code section 11342.570, and specifically, "in-use performance standards" within the meaning of section 43013. If the in-use testing reveals the OBD system does not function properly, in other words, is not "able to detect a fault before emissions exceed the malfunction criteria" (Cal. Code Regs., tit. 13, § 1971.5, subd. (c)(1)), another set of criteria is used to determine whether CARB's executive officer is required to order a recall. (See *id*., subd. (d)(3)(A).) Such an enforcement mechanism is also within CARB's regulatory authority. (See *Motor & Equipment Mfrs. Assn., Inc. v. Environmental Protection Agency* (D.C. Cir. 1979) 627 F.2d 1095, 1113 ["the absence or ineffectiveness of an enforcement program might endanger the ability of the standards to

18

accomplish the levels of emissions they seek, and thus an indirect relationship exists between enforcement procedures and the public health and welfare"].)

We also conclude the challenged regulations are designed to reduce air pollution caused by in-use emissions from motor vehicles through facilitating prompt repair of emission-related malfunctions and by providing an incentive to manufacturers to make improvements in emission system durability and performance. As stated in the rulemaking file: "By alerting the owner of malfunctions as they occur, repairs can be sought promptly, which results in fewer emissions from the vehicle. Additionally, the OBD system stores important information including identification of the faulty component or system and the nature of the fault, which would allow for quick diagnosis and proper repair of the problem by technicians. This helps owners achieve less expensive repairs and promotes repairs done correctly the first time." Moreover, in adopting the challenged regulations, CARB "anticipated that the manufacturers will produce increasingly durable, more robust emission-related components" in order "to avoid customer dissatisfaction that may be caused by frequent illumination of the MIL because of emission-related malfunctions." We cannot agree with the trial court that statements in the rulemaking file regarding the purpose of the challenged regulations must be disregarded. We need not accept the truth of these statements, e.g., properly working OBD systems actually result in fewer emissions, or manufacturers would in fact produce more durable emissions systems in response to the challenged regulations. For present purposes, it suffices to note the challenged regulations were designed with such objectives in mind. Whether they are reasonably necessary to achieve the objectives is a matter for the second stage of the analysis.

Nor do we agree with the trial court's conclusion the definition of "Nonconforming OBD System" found in title 13 of the California Code of Regulations, section 1971.5, subdivision (a)(3), negates the stated purpose of the challenged regulations. An OBD system is considered nonconforming "irrespective of whether

19

engines in the engine class, on average, meet other applicable emission standards (e.g., exhaust emission standards defined in [title 13 of the California Code of Regulations], section 1956.8, evaporative emission standards defined in [title 13 of the California Code of Regulations] section 1976)." (Cal. Code Regs., tit. 13, § 1971.5, subd. (a)(3).) Borrowing an analogy from CARB's opening brief, "OBD systems are akin to smoke detectors." The purpose of requiring properly functioning OBD systems is to reduce in-use emissions and related damage to the environment by alerting the vehicle operator of emission-related malfunctions as they occur to facilitate prompt repair just as the purpose of requiring properly functioning smoke detectors in a residence is to reduce fire damage (both to the occupants and to the structure) by alerting the occupants of the fire to facilitate their escape from the building and allow for the prompt calling of the fire department. The fact that a smoke detector can be defective without there being a fire does not negate its purpose. Similarly, the fact that an OBD system is considered nonconforming irrespective of whether engines in the engine class, on average, meet exhaust or evaporative emission standards does not negate its purpose, i.e., reduction of such emissions.

Finally, we agree with the trial court that sections 43104 and 43105 do not authorize CARB to adopt the challenged regulations. These provisions apply to "certification of new motor vehicles or new motor vehicle engines" and authorize CARB to adopt regulations establishing "test procedures and any other procedures necessary to determine whether the vehicles or engines are in compliance with the emissions standards established pursuant to Section 43101." (§ 43104.)[9] CARB is also specifically

---

[9]    Section 43104 provides: "For the certification of new motor vehicles or new motor vehicle engines, the state board shall adopt, by regulation, test procedures and any other procedures necessary to determine whether the vehicles or engines are in compliance with the emissions standards established pursuant to Section 43101. The

20

authorized to order a recall of such new motor vehicles or new motor vehicle engines "if the manufacturer has violated emission standards or test procedures and has failed to take corrective action." (§ 43105.)[10] However, the question is not whether these provisions expressly authorize the challenged regulations, but whether the Legislature's failure to specifically authorize CARB to adopt regulations regarding compliance testing of in-use heavy-duty engines, as opposed to new motor vehicle engines, and recall of engine classes with noncompliant OBD systems under certain circumstances, indicates a restriction on CARB's power to adopt such regulations.

In answering this question, we find *Ralphs Grocery Co. v. Reimel* (1968) 69 Cal.2d 172 to be instructive. There, Ralphs and other grocery stores challenged a rule adopted by the Department of Alcoholic Beverage Control (ABC) prohibiting quantity discounts in the sale of beer. (*Id.* at p. 176.) After holding the rule was within the authority granted to ABC in section 25006 of the Alcoholic Beverage Control Act, i.e., to adopt rules that " 'foster and encourage the orderly wholesale marketing and wholesale

---

state board shall base its test procedures on federal test procedures or on driving patterns typical in the urban areas of California."

**10** Section 43105 provides: "No new motor vehicle, new motor vehicle engine, or motor vehicle with a new motor vehicle engine required pursuant to this part to meet the emission standards established pursuant to Section 43101 shall be sold to the ultimate purchaser, offered or delivered for sale to the ultimate purchaser, or registered in this state if the manufacturer has violated emission standards or test procedures and has failed to take corrective action, which may include recall of vehicles or engines, specified by the state board in accordance with regulations of the state board. If a manufacturer contests the necessity for, or the scope of, a recall of vehicles or engines ordered pursuant to this section and so advises the state board, the state board shall not require such recall unless it first affords the manufacturer the opportunity, at a public hearing, to present evidence in support of the manufacturer's objections. If a vehicle or engine is recalled pursuant to this section, the manufacturer shall make all necessary corrections specified by the state board without charge to the registered owner of the vehicle or vehicle with such engine or, at the manufacturer's election, reimburse the registered owner for the cost of making such necessary corrections. [¶] The procedures for determining, and the facts constituting, compliance or failure of compliance shall be established by the state board."

distribution of beer,' " and was reasonably necessary to effectuate the purpose of the law (*id*. at pp. 175-180), our Supreme Court went on to hold the absence of specific statutory authorization for prohibiting quantity discounts in the sale of beer did not invalidate the rule. (*Id*. at pp. 180-183.) The court rejected the argument that because the Legislature enacted specific statutes "dealing with quantity discounts on milk and wine," but "did not specifically refer to quantity discounts on beer, the proscription of such discounts does not come within the purview of section 25006's rule-making authorization." (*Id*. at p. 182.) The court explained: "[P]laintiffs fail to appreciate the function of specific statutory mandates and general grants of power in a delegation of authority by the Legislature. To the extent that the Legislature considers a given problem and determines the best method of dealing with it, it may specifically include its resolution of the matter in statutory law; . . . for example, the Legislature considered the relationship between quantity discounts and the marketing of milk and wine, respectively, and described with particularity the administrator's power. But the Legislature's failure to include express provisions as to beer, rather than suggesting a restriction on the department's power to prohibit or limit quantity discounts, indicates only that the Legislature did not itself attempt to determine the proper relationship between the special problems of the marketing of beer and various methods of regulating it. Instead, the Legislature gave the department a general mandate: to use its expertise and power of continuous regulation as it sees fit to 'promote orderly marketing and distribution.' One tool available to accomplish this goal was the prohibition of quantity discounts. In not mentioning this method, the Legislature left the question of its propriety for the department." (*Id*. at pp. 182-183.)

Similarly, in *Payne*, *supra*, 16 Cal.3d 651, our Supreme Court upheld a regulation issued by the insurance commissioner limiting the amount of commission that may be paid to agents in the sale of credit life and credit disability insurance. (*Id*. at p. 653.) The court explained the Legislature "grant[ed] the commissioner broad discretion to

22

determine what reasonable rules and regulations in the area of credit insurance are necessary to promote the public welfare.  The commissioner, of course, has no power to vary or enlarge the terms of an enabling statute [citation], or to issue regulations which conflict with this or any other statute.  [Citation.]  On the other hand, the absence of any specific provisions regarding the regulation of the compensation of agents does not mean that such a regulation exceeds statutory authority; in our view, it indicates only that the Legislature did not itself desire to determine the proper relationship between this compensation and the effective regulation of the credit insurance market.  [Citations.]  Courts have long recognized that the Legislature may elect to defer to and rely upon the expertise of administrative agencies [citations]." (*Id*. at p. 656.)

Here, the Legislature granted CARB broad authority to adopt regulations designed to reduce air pollution caused by motor vehicle emissions as expeditiously as possible.  As we have explained, the challenged regulations are so designed.  The fact that the Legislature did not enact specific provisions regarding compliance testing of in-use heavy-duty engines, as it did with respect to certification testing of new motor vehicles and new motor vehicle engines, does not mean the challenged regulations are invalid.  "[I]n our view, it indicates only that the Legislature did not itself desire to determine the proper [method of regulating such testing]." (*Payne*, *supra*, 16 Cal.3d at p. 656.)  Nor do we accept EMA's assertion this amounts to "an unconstrained and unconstitutional delegation of legislative authority."  We explained in *Hess Collection Winery v. California Agricultural Labor Relations Bd.* (2006) 140 Cal.App.4th 1584, relied upon by EMA:  " 'Only in the event of a total abdication of [legislative] power, through failure either to render basic policy decisions or to assure that they are implemented as made, will this court intrude on legislative enactment because it is an "unlawful delegation," and then only to preserve the representative character of the process of reaching legislative decision.' [Citation.]" (*Id*. at p. 1605.)  Here, the Legislature has made the basic policy decisions regarding the need for a reduction in air pollution caused by motor vehicle

23

emissions as expeditiously as possible. (See *Western Oil & Gas Association v. Orange County Air Pollution Control Dist.* (1975) 14 Cal.3d 411, 419.) The details of achieving such reductions were delegated to CARB. As in *Hess Collection*, "[w]e perceive no unlawful delegation of legislative power in the Legislature's delegation to [CARB] of [CARB's] authority, based on its expertise in [air quality], to adopt [the challenged regulations]." (*Hess Collection*, *supra*, 140 Cal.App.4th at p. 1606.)

However, because cost-effectiveness and feasibility limitations are built into the grant of authority, if manufacturer in-use testing of OBD systems on heavy-duty engines is unduly "onerous and costly," as EMA alleges in its operative complaint, the regulations may fall outside the scope of authority. CARB has denied this allegation. Accordingly, this issue cannot be settled on the pleadings and the trial court should have denied EMA's motion for judgment thereon.

### B.

### *Reasonable Necessity*

The remaining question, whether the regulations are reasonably necessary to effectuate the statutory purpose, was not properly raised in EMA's motion for judgment on the pleadings. Nor does EMA advance an argument regarding the issue on appeal. However, in granting the motion, the trial court concluded the challenged regulations were not "reasonably necessary to effectuate the purpose of [sections] 43104 and 43105." While true, as already explained, these are not the sections authorizing the challenged regulations. The real question is whether CARB's determination that the challenged regulations are " 'reasonably designed to aid a statutory objective' " (*Payne*, *supra*, 16 Cal.3d at p. 657) was "arbitrary, capricious, or without reasonable or rational basis." (*Communities for a Better Environment v. California Resources Agency*, *supra*, 103 Cal.App.4th at p. 109.) EMA "has the burden of demonstrating that the evidence on which [CARB] relied does not reasonably support the [challenged regulations] in light of the purposes of the statute[s]" authorizing the regulations. (*Payne*, *supra*, 16 Cal.3d at

24

p. 657.)  Because EMA did not attempt to do so in its motion for judgment on the pleadings, the trial court erred in ruling against CARB on this issue.

DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court with directions to enter an order denying Engine Manufacturers Association's motion for judgment on the pleadings.  California Air Resources Board shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


        HOCH     , J.


We concur:


    MURRAY    , Acting P. J.


     DUARTE   , J.